**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**EASTERN DIVISION**

| | |
|---|---|
| LOSAL Unlimited, LLC, | ) |
| | ) |
|     **Plaintiff,** | ) |
| | ) |
| **v.** | )   **CASE NO.:  3:05-CV-01144-WKW** |
| | ) |
| SOUTHERN AIRCRAFT SALES, INC.; | ) |
| SIXTEEN JULIETTE, INC. d/b/a | ) |
| DAWSON AVIATION; and SID HALL, | ) |
| | ) |
|     **Defendants.** | ) |

**BRIEF IN OPPOSITION TO SUMMARY JUDGMENT MOTION**
**OF DEFENDANTS, SOUTHERN AIRCRAFT SALES, INC. AND SID HALL**

Plaintiff LOSAL Unlimited, LLC, files the following brief in opposition to the motions for summary judgment filed by Defendants Southern Aircraft Sales, Inc., and Sid Hall:

**STATEMENT OF MATERIAL UNDISPUTED FACTS**.

This lawsuit arises out of the purchase of a 1976 Beechcraft Sundowner airplane by LOSAL Unlimited, LLC ("LOSAL") of Auburn, Alabama from Defendants, Sid Hall and Southern Aircraft Sales, Inc. of Albany, Georgia. (Salatto Affidavit, Tab 2) This purchase occurred on August 1, 2002 and the aircraft was delivered to LOSAL at the Auburn Airport shortly thereafter. (Salatto Affidavit, Tab 2; Salatto Deposition, p. 47, l. 7, 8)

Patrick J. "Trey" Salatto, III and Joseph F. Lovvorn are the sole owners and principals of LOSAL. (Salatto Affidavit, p. 1) While both men were in the course of completing their training to receive a private pilot certificate, they decided that they wanted to purchase an aircraft. (Salatto Affidavit, p. 1) Neither had ever owned an aircraft before. (Salatto Affidavit,

p. 1)  They formed LOSAL Unlimited, LLC to own the aircraft and begin looking for an aircraft to purchase. (Salatto Affidavit, p. 1) They ultimately located Southern Aircraft Sales' website.  That website touted Southern Aircraft Sales as an expert on Beechcraft Sundowner aircraft and included the following statement:

> Southern Aircraft Sales owns all of its aircraft, and is the largest seller of Beechcraft Sundowners.  We know the Sundowner market better than anyone. We are your best choice for Sundowners!

(Salatto Affidavit, Tab 1).

Salatto contacted Southern Aircraft Sales and spoke with Sid Hall, who advised him that he was the owner of that business. (Salatto Affidavit, p. 1)  Hall told him that he had a Sundowner in stock which had a freshly-overhauled engine and a current annual inspection. (Salatto Affidavit, p. 1) Salatto and Lovvorn then went to Southern Aircraft Sales to see the aircraft, where they met Luther Herndon. (Lovvorn Deposition, p.29, l.19-22; Salatto Deposition, p.23, l.17-19; Salatto Affidavit, p. 2) At the time this meeting occurred, Herndon was inside the maintenance hangar at the airport and they were joined there by Hall. (Lovvorn Deposition, p.28, l. 17-23; p.29, l. 1-22) Salatto and Lovvorn then discussed the aircraft with Hall, during which time Hall stated on more than one occasion "I'll have Luther take a look at it", or "I'll ask Luther".  (Lovvorn Deposition, p.33, l. 7-11) When they told Mr. Hall that they wanted to have the aircraft inspected before purchase, Mr. Hall told them that they should let "his guy" Herndon do the inspection. (Salatto Affidavit, p.2)  Salatto and Lovvorn understood that to mean that Herndon was an employee of Southern Aircraft Sales. (Salatto Deposition, p.51, l. 21-23; p. 52, l. 3-12)  During that meeting, and in subsequent conversations between Lovvorn and Herndon, Herndon repeatedly talked about the work he did for Hall picking up

and dropping off aircraft, and volunteered that Hall had purchased him a GPS [Global Positioning System, a navigational aid] to carry with him while making flights.  (Lovvorn Deposition, p. 31, l. 10-23; p.32, l. 1-9).  Further, while in Lovvorn's presence, Hall gave Herndon instructions of the sort an employer would give an employee, such as "Luther, I need you to do this, or Luther, go do that."   (Lovvorn Deposition, p. 34, l. 22, 23; p. 35, l. 1-5).  Later, after LOSAL had purchased the aircraft and discussed with Herndon things that LOSAL wanted done to the plane, Herndon would say that he could not do certain things LOSAL wanted done because "Sid wouldn't allow it." (Salatto Deposition, p. 52, l. 16,17).

Lovvorn and Salatto did not like the appearance of the Sundowner that they had seen at Southern Aircraft Sales, and so told Hall that they did not want to buy it. (Salatto Affidavit, p.1) Hall then told them that he had another Sundowner that would be coming in "that he's getting overhauled and new paint, new interior." (Lovvorn Deposition, p. 27, l. 4-12).   Hall said the aircraft had "zero time" since a major engine overhaul, which Lovvorn understood to be the equivalent of a "certified new engine", and Hall further said that the aircraft had only 3,000 hours of total time. (Lovvorn Deposition, p. 37, l. 5-16).   At the suggestion of Mr. Hall, LOSAL agreed to use Luther Herndon to perform the pre-buy inspection of the aircraft that Salatto and Lovvorn requested.  (Salatto Affidavit, p.2; Lovvorn Deposition, p. 38, l. 4-9). The aircraft was ultimately delivered by Herndon to LOSAL at the Auburn Airport.  (Salatto Deposition, p. 47,  l. 7,8) Although the interior was not new as Hall had stated, the exterior of the aircraft had been repainted.  (Lovvorn Deposition p. 41-43).  The radios that Hall had agreed to put in the aircraft were also not installed, but Herndon called Hall and acted as intermediary, and Salatto and Lovvorn became satisfied that the radios would arrive later.

3

(Lovvorn Deposition, p. 42, l. 11-23; p. 43, l. 1-15)  After the purchase, LOSAL discovered a problem with deteriorated fresh air vents in the aircraft and improperly attached rear seats. (Lovvorn Deposition, p. 45, l. 12-23; p. 46, l. 1-10) Herndon repaired those items, but the seats broke again. (Lovvorn Deposition, p. 46, l. 2-23).

LOSAL received by facsimile transmission from Southern Aircraft Sales a single-sided document entitled "Aircraft Purchase Order".  (Salatto Affidavit, Tab 2).  The document did not have a reverse side or if it did, that reverse side was never provided to LOSAL.  (Salatto Affidavit, p. 2).  This Purchase Order was executed by Salatto for LOSAL on August 1, 2002. (Salatto Affidavit, Tab 2).

Although the aircraft was a 1976 model, the first entries in the airframe and engine maintenance logs which accompanied the aircraft at the time it was purchased by LOSAL are dated May 28, 2002. (Exhibits C and D, Defendants' Brief in Support of Summary Judgment) It is unclear from the engine log entry for that date when the work reflected in that entry was allegedly performed.  The engine log entry for May 28, 2002, states "[t]he engine was removed from the airframe for overhaul in September 2001."  (Exhibit D, p. 3) That  entry purports to have been made by Steven J. Barry of Aerotrace, Inc., of Sebastian, Florida.  Mr. Lovvorn testified that although both Hall and Herndon said that they had the original logs in their possession, and would provide them to LOSAL, they never did.  (Lovvorn Deposition p. 79, l. 7-23; p.80, l. 1-18).

After purchasing the aircraft, LOSAL took it back to Southern Aircraft Sales to have the routine, mandatory inspections performed. On March 24, 2003, as required by the regulations of the Federal Aviation Administration, an annual inspection was completed on the

aircraft by Luther Herndon. ( Exhibits C and D, Defendants' Brief in Support of Summary Judgment) The airframe log book entry for this inspection noted in pertinent part as follows:

> Removed Channel, (Structural; LWR fuselage LH), removed corrosion, alodined, and primed, reinstalled new channel from Beechcraft PN 169-040005-483 and angle PN 169-400005-487 between fuselage stations 68 and 94. All work completed IAW AC 43.13-1B/2a and Beech service and parts manuals… I certify this A/C to be in airworthy condition… Luther E. Herndon. (Exhibit C, Defendants' Brief in Support of Summary Judgment, p.8)

A 100 hour inspection was subsequently performed by Herndon on September 18, 2003. Herndon again certified the aircraft as airworthy, and the log book entry for this inspection does not reflect any airframe corrosion. (Exhibit C, Defendants' Brief in Support of Summary Judgment, p.9).

On January 31, 2004, while in flight and approaching the Auburn Airport, Lovvorn, who was flying the aircraft at the time, detected oil blowing onto the windshield. (Lovvorn Deposition p. 47, l. 16-23; p.48, l. 1-8). He was able to reach the airport and land. (Lovvorn Deposition, p. 47, l. 22,23) He asked that Auburn University Aviation determine the source of the oil, and the Auburn technicians located a crack in the engine block. (Lovvorn Deposition, p.49, l.13-22; p.50, l. 20-23). Paul Polhemus of Auburn Aviation asked him about the plane's history and when Lovvorn told him the plane was supposed to have zero time on a major engine overhaul, Polhemus told him that the last annual inspection and the overhaul "should have caught that type of crack." (Lovvorn Deposition, p. 50, l. 10-23; p. 51, l. 1-23) Polhemus told him that the crack would be expensive to repair "and that an aircraft with this little time since an overhaul should not have this type of problem." (Lovvorn Deposition, p. 57, l. 14-23) After the engine had been removed and overhauled in Centreville, Alabama at a cost to

LOSAL of $16,000, Auburn Aviation also detected a number of problems with the airplane's airframe. (Lovvorn Deposition, p. 84, l. 14-23; p. 85, l.1-18)    Auburn Aviation advised LOSAL that the aircraft had been crashed and a tail section repair was not properly done, and that the airframe was corroded. (Salatto Deposition, p. 68, l. 15-23; p. 70, l. 1-23; p.71, l.1-6; Salatto Affidavit, p. 2).   Paul Polhemus prepared a report dated August 8, 2005, in which he detailed the following problems with the airframe:

- Right wing –aft spar forward side has corrosion along bottom side.

- Forward main spar middle section of wing has corrosion.

- Main gear attach points has some corrosion build up, and forward wing section the same (of gear).

- Upper top main attach bolts skin has buckled on gear.

- Right fuel tank cap and lip corrosion – rust – tanks need to be purged and cleaned.

- Belly – panels – wing – forward corrosion on lighting holes and left forward channel support close to firewall upper section.

- Firewall – Corrosion especially on top left side quarter, very bad.

- Left wing – pilot mast full of dirt.

- Tail section needs elevator bearings.  Corrosion throughout tail section moderate to severe.

- Right Tail section by tail splice strap – severe corrosion – going forward in lap section, very bad rivets have corrosion on heads.

- Cabin area – control column severe corrosion on chains and pulleys.
- All wing attach points had corrosion – forward right attach point has 7 missing rivets and one that appears to have been sheared.

- Severe corrosion along cabin side panels numerous points throughout.

-       Left gear unsafe condition broken or sheared attach through bolt.

(Lovvorn Affidavit, Tab 1; Defendant's Exhibit 5 to Deposition of Salatto)

Polhemus states to both Salatto and Herndon that  the corrosion would have been present at the time they purchased the aircraft, and should have been detected by a properly performed annual or pre-buy inspection.  (Lovvorn Affidavit; Salatto Affidavit, p. 2).

At that time, the aircraft had been flown only 153.3 hours since LOSAL purchased it. (Salatto Affidavit p.2, Tab 3) Because the correction of all of the airframe problems would have cost more money than was economically justified, the overhauled engine was preserved and never reinstalled in the aircraft. (Salatto Deposition, p.81, l. 16-23; p. 82, l.1-5; Lovvorn Deposition, p.86, l. 11-23). When Lovvorn and Salatto called Hall about the problems, he told them they'd have to call Aerotrace (which Hall said performed the overhaul on the engine), and gave them the number. (Lovvorn Deposition, p.61, l. 15-18; p. 63, l. 15-19) Both Salatto and  Lovvorn were unsuccessful in contacting Aerotrace. (Salatto Deposition, p.124, l. 16-23; p. 125, l. 1-17)  This lawsuit thereafter commenced.

## **ARGUMENT**

## I.      **DEFENDANTS ARE WRONG IN ARGUING THAT THE STATUTE OF LIMITATIONS BARS LOSAL'S CLAIMS OF FRAUD AND SUPPRESSION.**

Defendants argue that there is no evidence that they fraudulently concealed the fact that the aircraft was in a defective condition at the time of sale so as to extend the statute of limitations to commence running within two years of the date that LOSAL discovered the aircraft's defective condition.  (Brief in Support of Motion for Summary Judgment, p. 10).  The evidence does not support that argument, however.

The problems with the airplane first began to surface after oil began spraying on the windshield of the aircraft while in flight on January 31, 2004. Shortly thereafter, while attempting to determine the source of the oil leak, Auburn Aviation discovered that the engine block was cracked. After the engine was rebuilt but before it was reinstalled, Paul Polhemus of Auburn Aviation discovered a number of problems with the airframe and detailed those problems to LOSAL by way of a report dated August 8, 2005. Mr. Salatto testified in his deposition that his recollection was that Polhemus had first notified them about those problems sometime between May, 2005 and the date of Polhemus' report. (Salatto Deposition, p. 120). This lawsuit was filed on December 2, 2005, less than two years after the first of the problems with the aircraft were detected. The reason the problems were not detected prior to that time was that all inspections which were performed on the aircraft after it was purchased from Southern Aircraft Sales were performed by Southern Aircraft Sales itself through its agent or employee Luther Herndon. There is substantial evidence that these conditions existed during the time Herndon would have performed those inspections but were not revealed to LOSAL until after the oil leak was diagnosed by Auburn Aviation.

Although Sid Hall states in an affidavit that Southern Aircraft Sales had no interest in Luther Herndon's business, 16 Juliette, and that Herndon was not an employee or otherwise to the subject to the control of Southern Aircraft Sales or Sid Hall, Alabama law is clear that Hall and Southern Aircraft Sales may be held vicariously liable for Herndon's conduct under the doctrine of apparent authority because he was held out as an agent or employee. Under Alabama law, "the existence and scope of an agency relationship are questions of fact to be determined by the jury." Lee v. YES of Russellville, Inc., 784 So.2d 1022, 1028 (Ala. 2000).

An agency relationship can be held to exist under Alabama law through the doctrine of agency by estoppel or apparent agency, regardless of whether the alleged principal retained control over the alleged agent.  Malmberg v. American Honda Motor Co., Inc., 644 So.2d 888 (Ala. 1994).  The Alabama Supreme Court noted in Malmberg that "[t]he test for determining whether an agency existed by 'estoppel' or by 'apparent authority' is based upon the potential principal's holding the potential agent out to third parties as having the authority to act…"  Id. at 891.  The supreme court went on to describe the doctrine as follows:

> "While some suggestion has been made that a distinction exists between apparent authority and authority grounded on estoppel, ... our cases and authority generally base the two upon the same elements.
>
> " ' "As between the principal and third persons, mutual rights and liabilities are governed by the apparent scope of the agent's authority which the principal has held out the agent as possessing, or which he has permitted the agent to represent that he possesses and which the principal is estoped to deny."
>
> " 'Such apparent authority is the real authority so far as affects the rights of a third party without knowledge or notice....' ...
>
> " 'When one has reasonably and in good faith been led to believe, from the appearance of authority which a principal permitted his agent to exercise, that a certain agency exists, and in good faith acts on such belief to his prejudice, the principal is estopped from denying such agency....' ...
>
> " 'The apparent authority of the agent is the same, and is based upon the same elements as the authority created by the estoppel of the principal to deny the agent's authority; that is to say, the two are correlative, inasmuch as the principal is estopped to deny the authority of the agent because he has permitted the appearance of authority in the agent, thereby justifying the third party in relying upon the same as though it were the authority actually conferred upon the agent.'"
>
> *Pearson v. Agricultural Insurance Co.,* 247 Ala. 485, 488, 25 So.2d 164, 167 (1946) (citations omitted); see *Wood v. Shell Oil Co.,* supra, 495 So.2d at 1038. The doctrine of apparent authority is based upon the actions of the principal, not those of the agent; it is based upon the principal's holding the agent out to a third party as having the authority upon which he acts, not upon what one thinks

an agent's authority might be or what the agent holds out his authority to be. See *Automotive Acceptance Corp. v. Powell,* 45 Ala.App. 596, 234 So.2d 593 (Ala.Civ.App.1970), quoted with approval in *Massey-Ferguson, Inc. v. Laird,* 432 So.2d 1259 (Ala.1983).

Malmberg v. American Honda Motor Co., Inc., supra. at 891 [emphasis supplied].

The evidence before this court indicates that Herndon was held out to LOSAL as the agent of Hall and Southern Aircraft Sales in their dealings with LOSAL.  Hall referred to Herndon as "his guy" in front of Salatto; Herndon met with the principals of LOSAL at the same location in which Hall and Southern Aircraft Sales conducted its business; Hall allowed Herndon to serve as intermediary between LOSAL and Southern Aircraft Sales in discussing the matter of the radios which Hall ultimately agreed to have installed in the aircraft as a precondition to its purchase by LOSAL; Hall gave orders to Herndon in the manner of an employer while in the presence of Lovvorn; the aircraft was delivered to LOSAL by Herndon; Hall had  "veto power" over Herndon's ability to make repairs to the aircraft; and Herndon made it clear to LOSAL that he frequently flew airplanes owned by Southern Aircraft Sales at the direction of Hall and that he had been provided with a GPS unit by Hall for his use in that function.  In light of this evidence, a jury could conclude that Herndon was an agent or employee of Hall and Southern Aircraft Sales, and that they are thus vicariously liable for his conduct.

Having found such an agency relationship to exist, a jury could find that Herndon concealed the actual condition of the aircraft from LOSAL both immediately prior to purchase, and thereafter until the time that the unsafe condition of the aircraft was discovered by Auburn University Aviation.  Because Herndon had both performed the prepurchase inspection

requested by LOSAL and the only post-purchase inspections of the aircraft which occurred before Auburn Aviation performed its airframe inspection in the May to August, 2005 timeframe described by Salatto, LOSAL would be entitled to the benefit of the tolling provision provided by Ala. Code § 26-2-3 on fraud actions:

> In actions seeking relief on the ground of fraud where the statute has created a bar, the claim must not be considered as having accrued until the discovery by the aggrieved party of the fact constituting the fraud, after which he must have two years within which to prosecute his action.

Consequently, the two year statute of limitations for LOSAL to prosecute such an action against Hall and Southern Aircraft Sales did not commence until sometime between May and August, 2005, and would certainly not have expired by the time this lawsuit was filed on December 2, 2005.

## II.    THERE IS SUBSTANTIAL EVIDENCE THAT SOUTHERN AIRCRAFT SALES AND HALL MISREPRESENTED THE CONDITION OF THE AIRCRAFT TO LOSAL AT THE TIME OF PURCHASE.

The existence of an intention to deceive is peculiarly a matter for the jury and is an issue on which a plaintiff should be allowed considerable latitude with respect to proof. SuperValu Stores, Inc. v. Peterson, 506 So.2d 317 (Ala.1987).  Even circumstantial evidence of events occurring after the misrepresentation was made may be relied upon to establish the defendant's intent to deceive.  Id.  Moreover, even innocent misrepresentations afford a basis for the recovery of damages.  Ala.Code §§ 6-5-110, 6-5-101.

The evidence before this court supports the conclusion that at the time of sale to LOSAL, Hall and Southern Aircraft Sales knew the aircraft was corroded and/or was not airworthy.  Southern Aircraft Sales and Hall argue that there is no proof that they did not know

11

that the aircraft was not airworthy, did not have a recent complete engine overhaul, had not successfully passed a recent annual inspection, and was not in good condition. Despite having held themselves out to the public as experts to be trusted with respect to the selection and purchase of Beechcraft Sundowner aircraft, Hall and Southern Aircraft Sales stake their argument on the claim that they were entitled to rely on the statements made in the entries in the aircraft maintenance logbook. In fact, that position mischaracterizes the nature of the misrepresentations made by them to LOSAL. Reliance on the logbook entries to absolve themselves from blame might be a reasonable position to take if the representation they made to LOSAL had been that "**the logbook entries for the aircraft** show that it was airworthy, had a recent complete engine overhaul, had successfully passed a recent annual inspection, and was otherwise in excellent condition." That is not what was represented to LOSAL, however. Rather, consistent with the website advertisement touting their expertise, Southern Aircraft Sales and Hall made statements about the aircraft's condition to LOSAL as representations of fact, not as statements about what the aircraft's documentation showed. These statements, evaluated in light of what later developed, could be found by a jury to have been misrepresentations or suppression of material facts. Alabama law recognizes that even statements couched in terms of opinions can be actionable if the party making the statements has knowledge of the true facts which is superior to that of the party to whom the statements were made. Randell v. Banzhoff, 375 So.2d 445 (Ala. 1979). That such misrepresentations were made is further reinforced by the fact that at Hall's urging, LOSAL had a pre-purchase inspection performed by Herndon, who had been held out to them as an agent or employee of Hall and/or Southern Aircraft Sales. Testimony by Paul Polhemus would establish that a

12

properly performed inspection would have revealed corrosion, and the Affidavit of Salatto establishes that LOSAL would have never purchased the aircraft had it known of this condition.

LOSAL recognizes that Hall and Southern Aircraft Sales have filed an affidavit by Polhemus in which he states, among other things, that "[w]ith regard to the various problems with the airframe noted in my report, I have no opinion as to whether the problems that I noted would have existed in or about August, 2002 to such an extent as to render the aircraft not airworthy at that time." (Exhibit F, Defendants' Brief in Support of Summary Judgment). However, as his report indicates, he detected severe corrosion at several locations on the airframe. He also told Salatto and Lovvorn that corrosion would have been present when LOSAL purchased the aircraft.[1] (Salatto and Lovvorn Affidavits). Salatto's affidavit establishes that LOSAL would not have bought the aircraft had he or Mr. Lovvorn known about the corrosion. Furthermore, his affidavit establishes that LOSAL kept the aircraft at the Auburn airport shielded from the elements during the three years that elapsed between the purchase and the discovery of the problems. From this evidence a jury could find that Hall and Southern Aircraft Sales made material misrepresentations and/or suppressed material facts about the aircraft's condition.

Consequently, there is ample evidence from which a jury could find that Hall and Southern Aircraft Sales misrepresented the condition of the aircraft at the time of the sale to LOSAL or, at the very least, made representations concerning the condition of the aircraft without sufficient prior inquiry to know whether those representations were true or false.

---

[1] Salatto and Lovvorn's testimony about what they had been told by Polhemus would be admissible at trial if Polhemus testified live in accordance with his affidavit, based on Rule 801(d)(1) of the Federal Rules of Evidence.

13

III.   **SUBSTANTIAL EVIDENCE EXISTS OF A CONFIDENTIAL RELATIONSHIP BETWEEN LOSAL, SID HALL AND SOUTHERN AIRCRAFT SALES AS WOULD SUPPORT A DUTY TO DISCLOSE THE CONDITION OF THE AIRCRAFT.**

In Alabama law, the determination of whether a confidential relationship between parties to a transaction exists so as to impose upon one party a duty to disclose material facts to the other is determined by an analysis of the operative facts concerning the particular circumstances under which that relationship was formed.  Trio Broadcasters, Inc. v. Ward, 495 So.2d 621 (Ala. 1986).

As the Alabama Supreme Court noted in <u>Trio Broadcasters</u>:

> Application of the "particular circumstances" language contained in <u>§ 6-5-102</u>, supra, necessarily requires a case-by-case consideration of several factors. Quoting from *Jim Short Ford Sales, Inc. v. Washington,* 384 So.2d 83 (Ala.1980), the Court, in *Berkel & Co. Contractors, Inc. v. Providence Hospital, supra,* stated:

> " 'A duty to speak depends upon the relation of the parties, the value [materiality] of the particular fact, the relative knowledge of the parties, and other circumstances. *Hall Motor Co. v. Furman,* 285 Ala. 499, 234 So.2d 37 (1970).... Thus, each case must be individually examined to determine whether a duty of disclosure exists; a rigid approach is impossible, and, indeed, the words of the statute itself counsel flexibility."

> 454 So.2d at 505, quoting *Jim Short Ford Sales, Inc. v. Washington,* 384 So.2d 83, 86-87 (Ala.1980).

In this case, ample evidence exists that Hall and Southern Aircraft Sales encouraged LOSAL to rely on its expertise in selection of an airplane which was in good and airworthy condition and that LOSAL was justified in so relying.  Southern Aircraft Sales' website touted a very particularized expertise on the subject of Beechcraft Sundowner aircraft.  LOSAL, by contrast, was comprised of two novice pilots who had never purchased an aircraft before.

Furthermore, when LOSAL rejected the first aircraft to them by Southern Aircraft Sales, Hall told them that he was about to "get in" an aircraft that would be exactly what they were looking for. He further suggested that the pre-buy inspection that LOSAL requested for its protection be performed by an aviation mechanic controlled by Hall and Southern Aircraft Sales. From these facts, a jury could conclude that Hall and Southern Aircraft Sales occupied such a position of trust and confidence in the minds of LOSAL's principals that Hall and Southern Aircraft they were obligated to reveal to LOSAL all of the information they possessed concerning the condition of the aircraft—as well as what they didn't know, i.e. the fact that they had no firsthand knowledge about the aircraft at all. In the section of their brief in which they argue that they had no such relationship with LOSAL, Hall and Southern Aircraft Sales rely on the opinion of the Alabama Supreme Court in <u>Young v. Serra Volkswagen, Inc.</u>, 579 So.2d 1337 (Ala. 1991). Hall and Southern Aircraft Sales argue that as in that case, LOSAL has failed to produce any evidence that the condition of the aircraft was not airworthy. That is untrue. Paul Polhemus advised the principals of LOSAL on more than one occasion that the aircraft would have had airframe corrosion at the time it was purchase by LOSAL. Polhemus discovered corrosion of a sufficient degree to render the aircraft not airworthy by no later than August, 2005. LOSAL had owned the aircraft approximately three years at that point, had stored it at Auburn, Alabama continuously during that time, sheltered from the elements. Furthermore, up to that point the aircraft had been inspected only by a technician controlled by Hall and Southern Aircraft Sales. In evaluating the evidence it is worth noting that Southern Aircraft Sales and Sid Hall apparently claim that that aircraft still does not have sufficient corrosion as to render it not airworthy, even though having in their

15

possession the Polhemus letter.  Their own retained expert testified that the corrosion he saw was minor and could be easily removed, even though his inspection took place nearly three years **after** Polhemus had determined that the aircraft had substantial corrosion and was not airworthy. (Exhibit 1)  Given these facts, a jury could certainly conclude that the aircraft was not in an airworthy condition at the time it was purchased by LOSAL.  Furthermore, LOSAL has, contemporaneously with this opposition to the motions for summary judgment, sought an extension of time from this Court for ruling on that motion in order to allow LOSAL take Polhemus' deposition and determine under oath exactly what his opinions and observations are.

**IV.    SUBSTANTIAL EVIDENCE EXISTS THAT SOUTHERN AIRCRAFT SALES AND SID HALL BREACHED THEIR CONTRACT TO DELIVER TO LOSAL AN AIRCRAFT WHICH WAS AIRWORTHY, HAD RECENTLY RECEIVED A COMPLETE ENGINE OVERHAUL, HAD BEEN SUBJECTED TO AND PASSED A RECENT ANNUAL INSPECTION, AND WAS OTHERWISE IN EXCELLENT CONDITION.**

As with the fraud claims, Hall and Southern Aircraft Sales rely upon the entries in the aircraft log book as evidence that the aircraft was in good and airworthy condition at the time it was delivered to LOSAL, and that it had received a recent engine overhaul.  The statements contained in the log book entries are not consistent with the true facts, and those facts are what determine that Hall and Southern Aircraft Sales breached their contract with LOSAL.  Those defendants did not agree to provide LOSAL with an aircraft which had log books with entries stating that the aircraft was airworthy, had recently had a complete engine overhaul, and had recently passed a complete annual inspection.  Rather, they agreed to deliver to LOSAL an aircraft which in fact possessed those characteristics.  They did not do this, and therefore breached their contract with LOSAL.

16

## V.    SUBSTANTIAL EVIDENCE EXISTS THAT SOUTHERN AIRCRAFT SALES AND HALL BREACHED EXPRESSED AND IMPLIED WARRANTIES THROUGH SALE OF THE SUBJECT AIRCRAFT TO LOSAL.

Ala. Code § 7-2-313 defines "express warranties" as follows:

**§ 7-2-313. Express warranties by affirmation, promise, description, sample.**

(1) Express warranties by the seller are created as follows:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

(2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

Furthermore, Ala. Code §§ 7-2-314 and 7-2-315 provide that warranties of

merchantability and fitness for a particular purpose are implied in a contract for sale:

**§ 7-2-314. Implied warranty: Merchantability; usage of trade; human blood and tissues.**

(1) Unless excluded or modified (Section 7-2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.

(2) Goods to be merchantable must be at least such as:

(a) Pass without objection in the trade under the contract description; and

17

(b) In the case of fungible goods, are of fair average quality within the description; and

(c) Are fit for the ordinary purposes for which such goods are used; and

(d) Run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

(e) Are adequately contained, packaged, and labeled as the agreement may require; and

(f) Conform to the promises or affirmations of fact made on the container or label if any.

(3) Unless excluded or modified (Section 7-2-316) other implied warranties may arise from course of dealing or usage of trade.

(4) Procuring, furnishing, donating, processing, distributing, or using human whole blood, plasma, blood products, blood derivatives, and other human tissues such as corneas, bones or organs for the purpose of injecting, transfusing, or transplanting any of them in the human body is declared for all purposes to be the rendition of a service by every person participating therein and whether any remuneration is paid therefor is declared not to be a sale of such whole blood, plasma, blood products, blood derivatives, or other human tissues.

### § 7-2-315. Implied warranty: Fitness for particular purpose.

Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under Section 7-2-316 an implied warranty that the goods shall be fit for such purpose.

The same facts which support the breach of contract claim against Hall and Southern Aircraft Sales likewise establish that they breached express warranties to LOSAL that the aircraft in fact possessed the characteristics which they told LOSAL that it did. Moreover, the fact that less than three years after the purchase of the aircraft, the engine block cracked and

18

substantial corrosion and improperly-repaired crash damage was discovered establishes that Hall and Southern Aircraft Sales breached the warranties of merchantability and fitness for a particular purpose. Hall and Southern Aircraft Sales argue that these warranties were disclaimed under the terms of the Aircraft Purchase Order. That argument has no merit because LOSAL never saw, much less agreed to those disclaimers.

The Affidavit of Salatto establishes that LOSAL **never received the reverse side of the aircraft purchase order** which, according to Hall and Southern Aircraft Sales, contained the disclaimers set forth in the Statement of Facts section of their summary judgment brief. While Alabama law does countenance a seller's disclaimers and/or limitations of liability associated with a sales transaction in certain particularized circumstances, those disclaimers must be in writing and conspicuous, as Hall and Southern Aircraft Sales concede at page fifteen of their brief. The evidence is undisputed that LOSAL never received the limitations upon which Hall and Southern Aircraft Sales rely. Obviously then, no written, conspicuous disclaimer of warranties was ever provided to LOSAL. Consequently, the defendants cannot rely on those disclaimers.

## VI.    THE STATUTE OF LIMITATIONS HAS NOT EXPIRED ON LOSAL'S NEGLIGENCE AND WANTONNESS CLAIMS.

As discussed previously, there is substantial evidence from which a jury could conclude that Herndon, acting as an agent for Hall and Southern Aircraft Sales, and/or Hall and Southern Aircraft Sales themselves, actively concealed the extent of the corrosion and other damage until the time that the engine of the aircraft failed and the damage was discovered in the aftermath. The Alabama Supreme Court has recognized that a defendant's fraudulent

concealment of damage caused by the defendant extends the running of the statute of limitations so that it is deemed to commence at the time the injury is discovered. <u>Ex parte Floyd</u>, 796 So.2d 303 (Ala. 2001). Accordingly, the statute of limitations on both LOSAL's negligence and wantonness claims would not have commenced until sometime after January, 31, 2004, when the cracked engine block manifested itself. This lawsuit was filed on December 2, 2005. LOSAL's negligence and wantonness claims were, therefore, timely asserted.

Regardless of the fraudulent concealment of the aircraft's condition, given the condition of the aircraft as later revealed, a jury could determine that Hall and Southern Aircraft Sales wantonly or intentionally sold an aircraft that was not airworthy to LOSAL and/or wantonly or intentionally failed to conduct adequate pre- and/or post-purchase inspections on the aircraft. Such conduct would be subject to the six-year statute of limitations contained in <u>Ala. Code</u> § 6-2-34. <u>See</u>, <u>McKenzie v. Killian</u>, 887 So.2d 861 (Ala. 2004).

<u>CONCLUSION</u>

For the reasons stated, the motions for summary judgment filed by Defendants Southern Aircraft Sales and Sid Hall should be denied.

Respectfully submitted,

**s/W. Dudley Motlow, Jr.**
William D. Motlow, Jr.
ASB-1563-L59W; MOT001
Attorney for Plaintiff, LOSAL Unlimited, LLC
Porterfield, Harper, Mills & Motlow, P.A.
22 Inverness Center Parkway, Suite 600
Birmingham, Alabama 35242-4821
Telephone: 205-980-5000
Facsimile: 205-980-5001
E-mail: wdm@phm-law.com

20

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

| | | |
|---|---|---|
| **LOSAL Unlimited, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO.:  3:05-CV-01144-WKW** |
| | ) | |
| **SOUTHERN AIRCRAFT SALES, INC.;** | ) | |
| **SIXTEEN JULIETTE, INC. d/b/a** | ) | |
| **DAWSON AVIATION; and SID HALL,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that on this the **20th** day of **June, 2008**, the foregoing was served upon the parties by placing a copy of same in the U.S. Mail, first-class postage pre-paid, to:

Matthew W. White, Esq.
Adams, Umbach, Davidson & White, LLP
Walker Building
205 South 9TH Street
Opelika, AL 36803

**s/W. Dudley Motlow, Jr.**
William D. Motlow, Jr.
Attorney for Plaintiff, LOSAL Unlimited, LLC